**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

CONSERVATION LAW FOUNDATION
                    Plaintiff,

            v.                              C.A. No. 15-165-ML

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Regina McCarthy, Administrator

and

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, REGION I,
H. Curtis Spalding, Regional Administrator
                    Defendants.

**ORDER AND MEMORANDUM**

The plaintiff in this action, the Conservation Law Foundation ("CLF")[1], on its own behalf and that of its individual members, brought a citizen suit under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA") against the United States Environmental Protection Agency ("EPA") by suing its Administrator, Regina McCarthy, and its Regional Administrator, H. Curtis Spalding (together with Regina McCarthy, the "Defendants"), in their official capacities. CLF alleges that the Defendants have failed to carry out "non-discretionary" duties under the CWA. Specifically, CLF contends that, although the

---

[1]

    CLF is a Massachusetts nonprofit environmental advocacy organization with approximately 4,000 members throughout New England, about 200 of whom reside in Rhode Island.

Defendants have determined that certain commercial and industrial dischargers contribute to water quality violations affecting several bodies of water located in Rhode Island, the Defendants have failed (1) to notify those dischargers that they are required to obtain discharge permits under the Rhode Island Pollution Discharge Elimination System; and (2) to provide them with applications for permit coverage. CLF seeks declaratory and injunctive relief. The matter before the Court is the Defendants' motion to dismiss the complaint. For the reasons that follow, the Defendants' motion is GRANTED.

## I.   Factual Background

### A. The Clean Water Act

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1994). "'This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality ... the word integrity  ... refers to a condition in which the natural structure and function of ecosystems [are] maintained.'" Dubois v. U.S. Dept. of Agriculture, 102 F.3d 1273, 1294 (1st Cir. 1996)(quoting United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 132, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985) (quoting H.R.Rep. No. 92-911, at 76 (1972) U.S.Code Cong. & Admin.News 1972, at 3744)).

To achieve its objective, the CWA, with certain limited exceptions, prohibits "the discharge of a pollutant by any person." 33 U.S.C. § 1311(a). (12) The terms "discharge of a pollutant" and "discharge of pollutants" are defined as "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). A "point source" is further defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The provision also notes that "[t]his term does not include agricultural stormwater discharges and return flows from irrigated agriculture." Id.

States and the federal government share responsibility for achieving the CWA's objective. 33 U.S.C. § 1251(g); Upper Blackstone Water Pollution Abatement Dist. v. U.S. E.P.A., 690 F.3d 9, 14 (1st Cir. 2012) cert. denied, --- U.S. ---, 133 S.Ct. 2382, 185 L.Ed.2d 1063 (2013)(citing Arkansas v. Oklahoma, 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992)). Specifically, the CWA requires states to adopt water quality

standards which protect against the degradation of the physical, chemical, or biological attributes of the states' waters and to designate the ambient water quality of their waters within their territory. 33 U.S.C. §§ 1251(a), 1313(c)(1), 1313(d)(4)(B) (1994); 40 C.F.R. § 131.12 (1995). Such "designated uses" of water bodies "specify the amount of pollutants that may be present in these water bodies without impairing their designated uses" (*e.g.* the propagation of aquatic life, recreation, aesthetics and use as public water supply). Upper Blackstone Water Pollution Abatement Dist. v. U.S. E.P.A., 690 F.3d at 14; 33 U.S.C. § 1313(c)(2)(A). Each state is required to "identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A).

In addition to identifying waters within a state's boundaries that fail to meet their designated water quality standards and ranking them in order of priority, "States must then begin the planning process for bringing these waters into compliance with water quality standards." Upper Blackstone Water

*Pollution Abatement Dist. v. U.S. E.P.A.*, 690 F.3d at 14; 33 U.S.C. § 1313(d),(e); 40 C.F.R. § 122.44(d)(1). To assist in this process, states must develop Total Maximum Daily Loads ("TMDLs") for those pollutants which are identified as suitable for such calculation. The TMDLs must be established "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). A TMDL is a calculation of the maximum quantity of a pollutant that may be added to a water body from all sources without exceeding applicable water quality standards. In other words, a TMDL "represents the sum of point source waste allocations, non-point source load allocations, and natural background sources of pollutants." *American Farm Bureau Federation v. U.S. E.P.A.*, 278 F.R.D. 98, 101 (M.D.Pa. 2011)(noting that "[a] TMDL is, in essence, a pollution budget, and it represents a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards").

As set forth in EPA regulations, TMDLs are calculated as "[t]he sum of the individual WLAs [Wasteload Allocation] for point sources and LAs [Load Allocation] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). A WLA is "[t]he

portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation." 40 C.F.R. § 130.2(h). An LA is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g).

After the State has established TMDLs for "all pollutants preventing or expected to prevent attainment of [identified] water quality standards," the calculations to establish TMDLs are subject to public review. 40 C.F.R. § 130.7(c)(1)(ii). Following submission of finalized TMDLs to the EPA, the EPA may approve the identification of waters and established loads, in which case the State must incorporate them into its continuing planning process. 40 C.F.R. § 130.7(d)(2). In the event the EPA disapproves the TMDL, it must "identify such waters in such State and establish such loads for such waters as [the Administrator] determines necessary to implement the water quality standards applicable to such waters." The State is then required to incorporate the EPA-set TMDLs into its continuing planning process. Id.

The CWA also prohibits the discharge of any pollutants from a point source unless authorized by an NPDES [National Pollutant Discharge Elimination System] permit. Id. 33 U.S.C. § 1311(a),

6

1342. NPDES permits "bring both state ambient water quality standards and technology-based effluent limitations to bear on individual discharges of pollution ... and tailor these to the discharger through procedures laid out in the Act and in EPA regulations." Upper Blackstone Water Pollution Abatement Dist. v. U.S. E.P.A., 690 F.3d at 14. The NPDES permit program provides permits to individual entities discharging point source pollutants by setting the maximum discharge levels of a particular contaminant. American Farm Bureau Federation v. U.S. E.P.A., 984 F.Supp.2d 289, 296 (M.D. Penn. Sept. 13, 2013). Together with the CWA requirement of state-established water quality standards that protect against the degradation of the physical, chemical, or biological attributes of the states' waters, "[the] most important component of the Act is the requirement that an NPDES permit be obtained." Dubois v. U.S. Dept. of Agriculture, 102 F.3d 1273, 1294 (1st Cir. 1996). Rhode Island is among the states authorized by the EPA to administer its own NPDES program.

In contrast to point source pollutants, nonpoint sources of pollution are generally excluded from CWA regulations, although states are encouraged to track and target such nonpoint source pollution. Oregon Desert Association v. U.S. Forest Service, 550 F.3d 778, 785 (9th Cir. 2008). "'Non-point source pollution has

7

been described as nothing more [than] a [water] pollution problem not involving a discharge from a point source.'" Conservation Law Foundation, Inc. v. U.S. E.P.A., 964 F.Supp.2d 175, 180 (D.Mass. Aug. 29, 2013)(quoting Defenders of Wildlife v. U.S. E.P.A., 415 F.3d 1121, 1124 (10th Cir.2005)). Accordingly, the focus of the CWA is generally on pollutants from identifiable point source discharges. Oregon Desert Association v. U.S. Forest Service, 550 F.3d at 785.

## B. Rhode Island Bodies of Water in this Litigation[2]

### 1. Mashapaug Pond

According to a TMDL Report[3] dated September 2007, the Mashapaug Pond watershed, which is located in the Pawtuxet River basin, is on Rhode Island's Section 303(d) list of impaired waters for "phosphorus, excess algal growth/chlorophyll a, pathogens, and PCBs [polychlorinated biphenyl, an organic chlorine compound]." Mashapaug TMDL p. vii.

---

[2]

The facts summarized in this section are based on the assertions in the Complaint (ECF No. 15), as supported by TMDL reports and other documents related to Rhode Island waters, such TMDL reports and other documents having been incorporated in the Complaint through embedded links to EPA and RIDEM websites.

[3]

CLF uses "TMDLs" to refer to the actual reports submitted by the State to EPA for approval; however, as Defendants point out, the TMDL is merely the sum of relevant WLAs and LAs, reflecting the numeric quantification of the total pollutant loading. The Court will refer to the State's submissions to the EPA as "TMDL Reports."

(http://www.dem.ri.gov/programs/benviron/water/quality/rest/pdfs/ mashpaug.pdf). The TMDL Report notes that "excessive phosphorus loads contribute to high plankton concentrations, which in turn contribute to low dissolved oxygen concentrations that impair fish and animal survival and loss of habitat." Moreover, "[t]he phosphorus loads also contribute to the growth of blue-green algae species that have been identified as hazardous to humans (through skin contact), making the pond unsafe for swimming." Id.

The largest single phosphorus (non-point) source (47%) impacting Mashapaug Pond is attributed to tributary flow from Spectacle Pond; 22% of the total phosphorus load comes from six storm drains. Mashapaug Pond TMDL Report p. viii. The source of pollution to the six identified storm drains "is runoff from non-point sources such as streets, parking lots, rooftops, and lawns." Mashpaug TMDL report p. 13; p. 46 (noting that "[e]ven though stormwater point source discharges to Mashapaug Pond exist, the contributing sources are non-point in nature.")

To reverse eutrophication [lack of oxygen caused by excessive nutrients] of Mashapaug Pond, the TMDL Report calls for a "nutrient load reduction of 62% from all storm drains and direct overland runoff areas as well as the base flow from Spectacle Pond ... in order to meet the water quality standard for hypoxia [oxygen deficiency]. Id. at 41. Specifically, the

TMDL Report recommends reduction of the pond's phosphorus inputs by using a phased approach of combining BMPs [best management practices], including a reduction of stormwater loads to Spectacle Pond and various other management techniques to improve conditions in Spectacle Pond, as well as cooperative efforts between the Cities of Cranston and Providence and the Rhode Island Department of Transportation ("RIDOT").

The TMDL Report for Mashapaug Pond was approved by the EPA on September 27, 2007 (within one week of its receipt). EPA's assessment notes that "RI DEM has adequately identified the water body, the pollutant of concern, and the magnitude and location of the sources of pollution." EPA New England's TMDL Review Document p. 2 (unpaginated) (https://ofmpub.epa.gov/waters10/attains_impaired_waters.show_tmd l_document?p_tmdl_doc_blobs_id=67876).

## 2. Spectacle Pond

Spectacle Pond, which constitutes the most significant source of phosphorus for Mashapaug Pond, is covered by the "9 Eutropic Ponds in Rhode Island" TMDL Report. Like Mashapaug Pond, Spectacle Pond is located in an urbanized area and subject to stormwater runoff from a high percentage of impervious cover. Eutropic Ponds TMDL Report p. 9. (http://www.epa.gov/region1/eco/tmdl/pdfs/ri/mashapaugpond.pdf).

10

The Spectacle Pond TMDL Report indicates that 53% of the Spectacle Pond watershed consists of high density residential development, whereas 17% of the area features commercial land use, and 10% features industrial land use. Id. The Spectacle Pond watershed includes 19 identified storm drains and 13 areas of concentrated surface water flow. Id. at 10.

This TMDL Report contains specific recommendations to reduce the phosphorus load impacting the water quality of Spectacle Pond (and, as a result, that of Mashapaug Pond). Such recommendations include, inter alia, the identification of all stormwater outfalls discharging directly into Spectacle Pond; the implementation of infiltration, filtration, and/or retention BMPs; the reduction of stormwater volume; increased street sweeping and other measures to address sediment loads to the pond; cleaning and maintaining culverts; and the installation of buffers to discourage use of the pond by waterfowl.

EPA approved the 9 Eutropic Ponds TMDL Report with the same September 27, 2007 communication addressing the Mashapaug Pond TMDL Report.

### 3. Bailey's Brook and North Easton Pond

Bailey's Brook, which flows into North Easton Pond,[4] is

---

[4]

North Easton Pond is covered under the 9 Eutropic Ponds TMDL Report and has been listed as impaired for phosphorus. 9 Eutropic

located within the Newport public drinking water supply system. Bailey's Brook TMDL Report p. 1. (http://www.dem.ri.gov/programs/benviron/water/quality/swbpdf/bailey.pdf). Although it is a Class AA fresh water stream, Bailey's Brook is not a terminal reservoir and its applicable designated uses are primary contact recreation (*e.g.* swimming) and secondary contact recreation (*e.g.* boating). Id. at 4. Bailey's Brook was placed on the 303(d) list by RIDEM because of elevated bacteria measurements, possibly indicating sewer leaks or other wastewater discharges. It is also recognized as a significant source of phosphorus for North Easton Pond. Among the potential sources of harmful bacteria in the Bailey's Brook watershed are "stormwater runoff from developed areas, illicit discharges, and agricultural activities." Id. at 5.

The Bailey's Brook TMDL Report recommends, *inter alia*, the reduction of stormwater runoff through implementation of BMPs, many of which are already in place; the elimination of illicit discharges; further implementation of an already existing Stormwater Management Plan by the Town of Middletown and RIDOT; the adoption of an Onsite Wastewater Management Plan; the evaluation of sanitary sewers and the reduction of leaks and overflows; the development of conservation plans for farming

---

Ponds TMDL Report p. 7.

activities; and the implementation of measures to minimize waterfowl-related impacts or that of animal waste. Id. at 7-9.

### 4. Sakonnet River and Portsmouth Cove

According to the March 2005 TMDL Report applicable to portions of the Sakonnet River and the Cove in Portsmouth, Rhode Island, the pollutant of concern in those waterbodies is "fecal coliform, a parameter used by Rhode Island as an indicator of human pathogens." The Sakonnet River-Portsmouth Park and the Cove Island Park TMDL Report p. 1. (http://www.dem.ri.gov/programs/benviron/water/quality/rest/pdfs/ sakonnet.pdf).

The impaired waters are closed to shellfishing "due to the potential public health risk associated with direct discharges of groundwater seeps and storm drain outfalls contaminated by human waste." Id. In addition, there is a Rhode Island Department of Health swimming advisory relative to the shoreline areas. Id.

According to the applicable TMDL Report, the two areas adjacent to the impaired waters are "densely developed" and "composed predominately of high-density residential development with a mix of commercial and industrial facilities, some of which are located directly adjacent to the shorelines." Id. at 3. The watershed of the identified portion of Sakonnet River and the Cove drains two neighborhoods and includes numerous stormdrain

13

discharge pipes, culverts, and various other discharge pipes from known and unknown sources. Id. The TMDL Report specifically points to a high rate of failing or improperly designed septic systems as a cause of the bacteria content in the impaired waters. Id. at 6.

The goal of the phased TMDL Report is "the elimination of all discharges of untreated or inadequately treated wastewater," together with additional monitoring to "ensure that water quality standards are met as remedial actions are accomplished." Id. at 35. The TMDL Report seeks to eliminate "failing septic systems that flow (via groundwater seeps and/or overland flow) into storm drains, illegal connections to storm drains, and illegal direct discharges." Id. at 35. The TMDL Report also notes that the Town of Portsmouth and RIDOT are already required to develop and implement stormwater management plans and obtain RIPDES permits for all stormwater discharges. Id. at 36. The TMDL Report was approved by the EPA in April 2005.

## II. Procedural History

On April 28, 2015, CLF filed a three-count complaint for alleged violations of non-discretionary duties under the CWA by the Defendants (ECF No. 1). Although summonses as to the EPA Administrator and the Regional EPA Administrator issued the following day, on August 12, 2015, CLF requested an extension to

serve the complaint on or before February 26, 2016 (ECF No. 4). Two months prior to filing the complaint, CLF sent 60-day "Notice Letters" to the Defendants as well as the Attorney General of the United States; such Notice Letters are required under the CWA before the filing of a citizen suit pursuant to 33 U.S.C. § 1365(a)(2), (b)(1)(A).

On June 10, 2016, the Defendants filed a motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief could be granted (ECF No. 14). On June 20, 2016, CLF filed an amended complaint (the "Complaint") which included three new paragraphs that made reference to certain "EPA guidance documents" (Complaint at ¶¶ 44-46).

On August 11, 2016, the Defendants filed a motion to dismiss the Complaint for lack of jurisdiction and for failure to state a claim upon which relief could be granted (ECF No. 17). CLF responded with an objection on September 8, 2016 (ECF No. 19), to which the Defendants filed a reply on September 29, 2016 (ECF No. 23). On October 20, 2016, CLF filed a sur-reply (ECF No. 24).

On October 25, 2016, the Court held a hearing on the Defendants' motion to dismiss the Complaint, in which both parties took the opportunity to state their respective positions and to respond to questions from this Court. The Court took the matter under advisement to issue a written decision.

### III. Standard of Review

A motion to dismiss for lack of subject matter jurisdiction is governed by Fed. R. Civ. P. 12(b)(1). A motion to dismiss for failure to state a claim upon which relief may be granted is governed by Fed. R. Civ. P. 12(b)(6). If a motion is brought under both 12(b)(1) and 12(b)(6), "a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." De La Cruz v. Irizarry, 946 F.Supp.2d 244, 249 (1st Cir. 2013)(quoting Northeast Erectors Ass'n of BTEA v. Secretary of Labor, Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir.1995) (citing 5A Charles Wright & Arthur Miller, Federal Practice and Procedure § 1350, at 210 (1990)).

The standard of review accorded a dismissal under either Rule 12(b)(1) or 12(b)(6) is "similar." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). Accordingly, in considering a motion to dismiss a complaint, the Court must construe the complaint in the light most favorable to the plaintiff, taking all well-pleaded facts as true, and giving the plaintiff the benefit of all reasonable inferences. Arruda v. Sears, Roebuck & Co., 310 F.3d 13 (1st Cir. 2002). In order to withstand a motion to dismiss, a claim "must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." Katz v. Pershing, LLC, 672 F.3d 64, 72-73 (1st Cir. 2012)(citations

omitted). The complaining party must include "factual content that allows the court to draw a reasonable inference" in the pleader's favor. Id. "If, under any theory, the allegations are sufficient to state a cause of action in accordance with the law," the motion to dismiss must be denied. Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir.1994). The Court ignores, however, "statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action-elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). In addition, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Johansen v. United States, 506 F.3d 65, 68 (1st Cir.2007).

Although the Court generally may not consider documents outside of the complaint unless it converts the motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment, it may make an exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The Court may also consider materials outside the pleadings on a Rule 12(b)(1) motion. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).

Claims against the EPA, as an agency of the United States,

17

are generally barred by sovereign immunity, unless permitted by a specific waiver. Sierra Club v. Whitman, 268 F.3d 989, 901 (9th Cir. 2001). The same applies to suits against EPA Administrators in their official capacity. Id. (citing Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963)). Citizen suits brought under the CWA against the Administrator are permitted only "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). Put another way, if the EPA acted within its discretion or if the alleged act or inaction did not involve a nondiscretionary duty, this Court has no jurisdiction over the matter.

## IV.  The Parties' Contentions

A. CLF

In its Complaint, CLF asserts that the Defendants have failed (1) to notify "certain commercial and industrial dischargers" that they are required to obtain discharge permits under the Rhode Island Pollution Discharge Elimination System; and (2) to provide such dischargers with applications for permit coverage. Complaint p. 2. CLF contends that the Defendants' duties to perform such acts are "non-discretionary" under the CWA and that those duties are triggered by the Defendants' determination that the dischargers are contributing to water

18

quality violations and require stormwater controls. Id. at 1-2.
CLF asserts jurisdiction under the citizen suit provision of the
CWA for "failure of the Administrator to perform [an] act or duty
... which is not discretionary." 33 U.S.C. 1365(a)(2). Complaint
at 3.

CLF suggests that the EPA's approval of TMDLs for the Rhode
Island waterbodies at issue constitutes a determination by the
EPA that (1) stormwater discharges from commercial and industrial
facilities contribute to violations of water quality standards
governing bacteria and phosphorus concentrations in those water
bodies; and (2) stormwater controls are needed for stormwater
discharges from commercial and industrial facilities. Complaint
at 13.

B. EPA

The Defendants take the position that because the EPA, in
approving the TMDLs at issue in this litigation, did not make a
determination that NPDES [National Pollutant Discharge
Elimination System] permits are required, there is no legal
requirement for the EPA to notify dischargers of permit
requirements or to send them permit applications. Specifically,
the Defendants contend that, in order to subject otherwise
unregulated stormwater discharges to permitting, the Regional
Administrator or the state permitting authority must make an

19

affirmative determination that "the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C. §1342(p)(2)(E)(generally known as EPA's residual designation authority). The Defendants reject CLF's contention that approval of a TMDL, in and of itself, constitutes a residual designation determination and, therefore, imposes a permit requirement on stormwater discharges.

The Defendants also assert that CLF has failed to identify a nondiscretionary duty that is enforceable under the CWA citizen suit provision and they contend that, in the absence of such nondiscretionary duty, the Complaint must be dismissed for lack of jurisdiction.

## V.  Discussion

It is evident from the statutory provisions of the CWA that, unlike point source discharges, which require authorization under Section 301(a) of the CWA, 33 U.S.C. § 1311, the regulation of stormwater discharges is limited. Pursuant to Section 402(p), 33 U.S.C. § 1342(p)(2) a permit for stormwater discharges is required if (1) a permit for the discharge had been issued prior to February 4, 1987; (2) the discharge is associated with industrial activity; (3) the discharge is from a municipal separate storm sewer system serving a population of 250,000 or

more; (4) the discharge is from a municipal separate storm sewer system serving a population of 100,000 or more, but less than 250,000; and (5) the discharge is one "for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C. § 1342(p)(2).

The corresponding regulations for stormwater discharges not otherwise requiring an NPDES permit that are relevant to the instant case are set forth in 40 C.F.R §122.26(a)(9)(i)(C) and (D). An NPDES permit is required under the following circumstances:

> (C) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that storm water controls are needed for the discharge based on wasteload allocations that are part of "total maximum daily loads" (TMDLs) that address the pollutant(s) of concern; or
>
> (D) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States. 40 C.F.R §122.26(a)(9)(i)(C),(D).

Based on the foregoing regulations and Section 402(p) of the CWA, CLF takes the position that EPA's approval of TMDL Reports submitted by RIDEM constitutes an exercise of EPA's residual designation authority.

The documents underlying this litigation are several TMDL Reports related to six Rhode Island waterbodies that have been identified as impaired and placed on Rhode Island's 303(d) list because they are not meeting applicable standards for various pollutants, including phosphorus and/or bacterial waste. As required under the CWA, RIDEM established TMDLs for each pollutant affecting the six waterbodies and submitted the respective TMDL Reports to the EPA.

The Mashapaug TMDL Report, which identifies stormwater runoff from the Spectacle Pond as the primary source of phosphorus discharge, features an implementation plan that includes various BMPs to reduce stormwater loads to Spectacle Pond, as well as the implementation of BMPs for municipal storm sewer systems operated by the City of Providence and RIDOT. The Mashapaug TMDL Report does not identify individual point sources for pollutant discharges nor does it recommend the issuance of NPDES permits to any new discharges.

The corresponding EPA approval document notes that there are no permitted, wastewater point sources in the TMDL study area. The document also acknowledges that "sources of stormwater from developed areas which contribute to runoff through identified culverts, pipes, or other conveyances are ... NPDES-permitted point sources" and that the TMDL includes a "wasteload allocation

for the stormwater runoff from those permitted sources." EPA Approval of Mashapaug TMDL Report ¶ 5. With respect to the Mashapaug TMDL Report's implementation plan, EPA notes that it "is taking no action on the implementation plan." Id. at ¶ 9.

In sum, the EPA approval document is limited to reviewing and ascertaining that and how the respective TMDL Report meets the statutory and regulatory requirements of TMDLs in accordance with Section 303(d) of the CWA. Nothing in the EPA approval document indicates (1) that EPA has conducted its own analysis or fact finding; that (2) that EPA has made an independent determination that the stormwater discharge into Mashapaug Pond contributes to a violation of water quality standards; and/or (3) that additional NPDES permits should be required for stormwater discharges into Mashapaug Pond.

The TMDL Reports for the other five waterbodies and their respective EPA approval documents follow the same pattern. The TMDL Reports for Spectacle Pond, North Easton Pond, and Bailey's Brook reflect that all three waterbodies are negatively impacted by stormwater runoff from developed areas, many of them commercial and/or industrial. In addition, Bailey's Brook is impacted, *inter alia*, by sewer leaks, illegal discharges, and agricultural activities. Segments of the Sakonnet River and the Cove, on the other hand, which have been identified in the

23

applicable TMDL documents for fecal coliform bacteria, are impacted by failing septic systems, illegal sewer connections to storm drains, and illegal direct discharges. None of these TMDL Reports identify particular point sources or individual dischargers of pollutants.

Like EPA's approval of the Mashapaug TMDL Report, the EPA approval documents related to these five waterbodies contain no independent determinations by the EPA that the stormwater discharges contribute to water quality violations or that they constitute significant contributors of pollutants to those waters. Moreover, the EPA approval documents explicitly refrain from approving or taking action on the implementation plans contained in the TMDL Reports and they do not call for the issuance of NPDES permits.

None of the TMDL Reports in this case specifically identify point sources of the identified pollutant discharges, nor do they require NPDES permits as part of their implementation plans. The EPA, in approving the TMDL Reports, made no independent determination of RIDEM's findings or analysis, nor did it explicitly approve the submitted implementation plans. Rather, the EPA's approval appears to be limited to a summary of the TMDL Reports and an acknowledgment that the TMDLs meet statutory and regulatory requirements.

Under those circumstances, CLF cannot close the gap between RIDEM's assessments of the impaired waterbodies and the EPA's alleged duty to notify stormwater dischargers of NPDES permit requirements or to provide them with permit applications. In the absence of an independent determination by the EPA that the stormwater discharges contribute to a violation of a water quality standard or that they are significant contributors of pollutants to the waterbodies at issue, *i.e.*, in the absence of EPA's exercise of its "residual designation authority," the EPA's election not to require permitting for stormwater discharges does not constitute a failure to perform a nondiscretionary duty under the CWA. Accordingly, the Court has no jurisdiction over the matter and CLF's Complaint cannot withstand the Defendants' motion to dismiss this action.[5]

## Conclusion

For the reasons stated herein, the Defendants' motion to dismiss the Complaint is GRANTED and the Complaint is DISMISSED

---

[5] The Court notes that today's decision does not leave CLF without a remedy. As noted by the Defendants in their briefs and at the October 25, 2016 hearing, CLF has the option of filing a petition for designation under 40 C.F.R. § 122.26(f)(2). Under that provision, "[a]ny person may petition the Director to require a NPDES permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 40 C.F.R. § 122.26(f)(2). Should CLF be dissatisfied with the outcome of its petition, it could then challenge the EPA under the Administrative Procedure Act.

with prejudice.


SO ORDERED.

/s/ Mary M. Lisi

Senior United States District Judge
December 13, 2016